**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**LEEDOM MANAGEMENT GROUP,**
**INC., et al.,**

              **Plaintiffs,**

**v.**                                       **Case No. 8:11-cv-2108-T-33TBM**

**SUSAN PERLMUTTER, et al.,**

              **Defendants.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court on **Plaintiffs' Motion for Preliminary Injunction against Defendant Perlmutter** (Doc. 17), Plaintiffs' Motion for Temporary Restraining Order Against Defendant Perlmutter (Doc. 26),[1] and Defendant's response in opposition (Doc. 40).[2] Oral arguments on the motions were conducted January 5, 2012, and January 18, 2012. For the reasons that follow, I recommend Plaintiffs' request for preliminary injunctive relief be granted.

---

[1]The court initially granted Plaintiffs' request for a temporary restraining order (TRO). *See* (Doc. 28). Pursuant to the court's Order, the TRO was in effect until January 5, 2012. *Id.* at 8. Thereafter, the TRO was continued by stipulation through the date of the court's decision on the motion for preliminary injunction.

[2]Additionally, the parties have filed affidavits and other documentary evidence in support of their respective positions. *See* (Docs. 17-1 through 17-13; 38-1 through 38-2; 39-1 through 39-3; 42-1 through 42-4, 44-1, 44-2, 45). Also before the court in connection with other motions filed but which appear relevant to the instant motions are Docs. 12-1; and 22-1 through 22-3.

A.

Plaintiffs, Leedom Management Group, Inc. ("LMG") and Paymaxx Pro LLC ("Paymaxx"), initiated this action against Defendants, Susan Perlmutter ("Perlmutter" or Defendant) and Sigma Payment Processing, Inc. ("Sigma"), on September 16, 2011, by the filing of an eight-count Complaint for damages and injunctive relief (Doc. 1).[3]  By their Complaint, Plaintiffs assert claims for misappropriation of trade secrets in violation of Fla. Stat. §§ 688.001, et seq., (Count I), breach of contract (Count II), fraud in the inducement (Count III), breach of fiduciary duty (Count IV), constructive fraud (Count V), tortious interference with business relationships (Count VI), temporary and permanent injunctive relief (Count VII), and civil conspiracy (Count VIII).  Jurisdiction of the court is invoked on the basis of diversity.

LMG and Paymaxx (collectively "Leedom" or "Plaintiffs") are Florida corporations with their principal place of business in Sarasota, Florida.  Paymaxx is in the business of providing ACH and credit card processing services to the automotive industry.  LMG is the common paymaster for Paymaxx.  Defendant, Susan Perlmutter, a former employee of Leedom, is residing in or about Murfreesboro, Tennessee.  Sigma is a Texas corporation that is alleged to have been formed by a competitor of Leedom's that works with Perlmutter to solicit Leedom's clients.

By their motion for preliminary injunction and as argued at the hearing, Plaintiffs urge the court grant injunctive relief to preclude Defendant from improperly using and/or

---

[3]Sigma was subsequently dismissed with prejudice.  *See* (Docs. 8, 9).

disclosing their confidential proprietary trade secret information and from soliciting their clients. Perlmutter commenced employment with Leedom in February 2011 under the terms of an Offer Letter. Plaintiffs maintain that during the course of Perlmutter's employment with them, she was privy to confidential, proprietary and trade secret business information including business analyses and conditions, customer lists (active and potential), proprietary computer applications, financial health, forecasts, internal operations, strategic planning, sales trends, pricing structure, cost algorithms and other systems designed for Paymaxx's operations. Plaintiffs contend that during her employment and after her termination, Perlmutter violated the non-disclosure, non-solicitation, and non-compete provisions of her February 14, 2011, Offer Letter. They urge her violative conduct is causing irreparable harm to their reputation and goodwill in the industry and that such harm cannot be otherwise remedied by an award of damages. Because Perlmutter's actions threaten to injure or completely destroy the competitive advantage Leedom has worked so hard to develop over time and at great expense, Plaintiffs argue that injunctive relief will not be adverse to the public interest and therefore should be granted.

In response to Plaintiffs' arguments, Perlmutter urges that Plaintiffs' request for injunctive relief must be denied as their proof is wholly lacking, and by their litigious conduct, she is the one being harmed because Plaintiffs' tactics are substantially impairing her from servicing her own clients. As a consequence, Defendant suggests that the $10,000 bond required to be posted by Plaintiffs is woefully inadequate as the TRO is costing her nearly $100,000 per month in business. (Doc. 40). Perlmutter's argument is supported by her

affidavit. *See* (Doc 38-1). Therein she claims ownership of a sizable "book of business," namely, the customer list attached to the Offer Letter, which is at the heart of this dispute. According to Perlmutter, the book of business was developed by her in over fifteen years of industry experience and while she was a principal with MBK, with whom she previously worked. The consideration paid to MBK to release this book of business to her when she left to join Leedom was paid by Perlmutter and not Leedom. Thus, she claims she liquidated a 26% interest in stock plus release of a $65,000 loan.[4] No assignments or agreements were executed giving Plaintiffs any interest in this book of business. She maintains that Plaintiffs are wrongfully claiming entitlement to these customers and wrongfully seeking to prevent her from contacting and doing business with them.

Certain facts are wholly undisputed. Perlmutter was previously employed as a principal with MBK, a Tennessee company also engaged in the payment processing industry. She terminated her employment with MBK to come work for Leedom as Vice President of Paymaxx. In conjunction with her employment with Leedom, Perlmutter executed an Offer Letter (Doc. 17-1) that provided in pertinent part as follows:

> By signing this letter, you recognize that Leedom's business, financial structure, employee matters, computer software programs and reports, techniques, methods, pricing structure, systems, plans and policies, employees, former employees, customers, clients, potential customers and clients, customer contact persons, customer needs, customer references, leads and suppliers which you will obtain as a result of your

---

[4]Defendant files with her affidavit a copy of the stock redemption agreement with MBK wherein a portion of a shareholder loan was forgiven by Perlmutter and stock in MBK transferred in consideration for, inter alia, a limited release to Perlmutter and Leedom from the Non-Compete provisions of her agreement with MBK. *See* (Doc. 45 at 16-18).

employment with Leedom are proprietary in nature and are trade secrets of Leedom. They will be disclosed to you only for use in your capacity as an employee of Leedom. In addition, you (sic) business of Leedom.[5] Accordingly, you expressly agree that during your employment by Leedom and for a period of 1 year thereafter, within a 50 mile radius of any location in which Leedom is conducting its business, you shall not, directly or indirectly, either as an individual or for any other entity or person: (a) engage in any business or endeavor which is similar to all or any portion of the business of Leedom or undertake to work for or with any entity which is engaged in any business or endeavor which is similar to all or any portion of the business of Leedom; or (b) disclose any information relating to Leedom to any entity for any reason, unless such disclosure is on Leedom's behalf and reflects the best interests of Leedom; or (c) solicit any entity which Leedom has established a substantive business relationship for a period of 1 year following the termination of your employment by Leedom.

Except in the ordinary course of Leedom's business, you may not divulge to any other person not then employed by Leedom any confidential or trade secret information of Leedom. In addition, you may not induce or attempt to induce any employee or contractor of Leedom to terminate his or her employment or hire, or solicit to hire, any of the independent contractors or personnel associated directly or indirectly with Leedom.

(Doc. 17-1 at 2-3).[6]

By the terms of the Offer Letter, Defendant was eligible for certain incentives, as set forth in the Schedule of Incentives (Doc. 17-1 at 4), based on her representation that she would "bring to Leedom the customers identified in Exhibit A" to the letter (Doc. 17-1 at 5-

---

[5]The omission within the Offer Letter appears in the original. Plaintiff's Complaint (Doc. 1 at 3) suggests how this provision was supposed to read, at least according to Plaintiffs.

[6]Defendant submitted a prior version of the Offer Letter that was dated December 2010 (Doc. 22-1). That version was not signed by Defendant. The operative language regarding the covenants as set forth above appears to be the same in both letters.

12). The parties wholly dispute who may service this book of business at present. Plaintiffs urge that these customers became Leedom's upon Defendant's employment with Leedom. Perlmutter contends that this "book of business" is hers, as evidenced by the fact that she developed it while she was employed with MBK and she was the one, not Leedom, who paid MBK to release the book of business to her upon termination of her employment with MBK.[7]

As for the alleged violations, Plaintiffs maintain that shortly after commencing her employment, Perlmutter began engaging in conduct violative of the restrictive covenants of the Offer Letter. Specifically, Plaintiffs claim the following violations:

(1) Perlmutter downloaded, printed and/or copied potential and active customer lists developed by Leedom;[8]

(2) Perlmutter formed two corporations that were actively competing against Leedom in the payment processing industry and she used Leedom's confidential client list to solicit customers on behalf of these companies;[9]

---

[7]*See* (Docs. 38-1, 45 at 16-18).

[8]This statement is made "upon information and belief" according to the affidavit of Christopher Leedom, president of LMG and Paymaxx, submitted on behalf of Plaintiffs. (Docs. 17-7, ¶ 19).

[9]It is not disputed that Perlmutter formed at least one company while she was employed with Leedom. This information was first learned by Leedom from MBK who forwarded to Leedom in May 2011 copies of the articles of incorporation for Perlwood Holdings, LLC (Docs. 17-7 and 17-9). The allegations regarding the use of confidential client information is referenced in Leedom's affidavit, but not otherwise well-supported.

(3) Perlmutter copied and confiscated Leedom documents containing private and confidential information for use at her competing businesses;[10]

(4) Perlmutter used Leedom resources to process "her" clients payments;[11]

(5) Perlmutter solicited and used current Leedom employees to aid her in her business ventures.[12]

Leedom terminated Perlmutter June 17, 2011.  (Doc. 17-3).  Plaintiffs allege that after her termination, Perlmutter continued to violate the restrictive covenants of the Offer Letter in the following ways:

(6) using Leedom's confidential information, Perlmutter commenced a telephone and email campaign to solicit Leedom clients to leave Leedom and instead do business with her, one of her competing companies, and/or Sigma;[13]

---

[10]The affidavit of Chris Leedom reiterates this statement, but does not otherwise identify what documents were copied and confiscated or indicate his basis of knowledge. (Doc. 17-7, ¶ 23).

[11]This statement is also made by Mr. Leedom in his affidavit and seemingly relates to work done through Perlwood Holdings, LLC, but again, this is without further supporting basis.  (Doc. 17-7, ¶ 25).

[12]Plaintiffs allege that Perlmutter solicited current Leedom employees, Vanessa Woods and Justin Duncan, to aid her in her business ventures.  (Doc. 17, ¶ 24).  This allegation is supported by the affidavit of Mr. Leedom (Doc. 17-7, ¶ 26), and again appears related to the Perlwood Holdings, LLC, matter.  A letter dated May 19, 2011, from MBK's counsel which accuses Justin Duncan of accessing MBK's internal network and downloading proprietary data for his and Leedom's benefit is also proffered.  (Doc. 17-8).

[13]*See* n.14, *infra*.

(7) Perlmutter began soliciting Leedom clients on September 12, 2011, on behalf of Sigma, requesting that they terminate their relationship with Leedom and move to Sigma;[14]

(8) Perlmutter provided competitors, AutoStar and Sigma, with Leedom's proprietary and confidential business information;[15]

(9) Perlmutter made false representations to AutoStar which resulted in AutoStar terminating its agreement with Leedom;[16]

(10) Perlmutter formed another competing company Perlpay Systems;[17]

(11) Perlmutter continues to use Leedom's confidential information including business analyses and conditions, customer lists (active and potential), proprietary computer applications, financial health, forecasts, internal operations, strategic planning, sales trends, pricing structure, cost algorithms and other systems designed for Paymaxx's operations;[18] and

---

[14]In support, Plaintiffs file copies of Perlmutter's email to Mark Barr of South Jersey Auto dated September 12, 2011, wherein Perlmutter announces "Sigma" as her new payment brand. (Doc. 17-4 at 2-3). Plaintiffs also submit a copy of Perlmutter's email to undisclosed recipients dated December 2, 2011, wherein she announces that she is in business under the new name, Perlpay Systems. (Doc. 17-6 at 2). The letter states, "With a formal request to me to service your ACH account, and a cancellation to Paymaxx Pro, you may eliminate an arbitrary "Compliance Fee" because you are (sic) compliance." *Id.* It appears a copy of this email was sent to Stephen Barrett of Barrett Motors, Inc., who in turn forwarded it to Leedom. *Id.* at 3-4.

[15]This statement contained in the Leedom affidavit is made "upon information and belief." (Doc. 17-7, ¶ 31).

[16]Plaintiffs submit a letter from Allen Dobbins, president and CEO of AutoStar, to Leedom wherein he indicates, "[p]ursuant to our discussions," he is terminating the Revenue Share Agreement AutoStar had with Leedom. (Doc. 17-11).

[17]Defendant does not dispute that, after leaving Leedom's employ, she formed Perlpay Systems, a Tennessee limited liability company on October 20, 2011. (Doc. 39-1)

[18]This statement is made "upon information and belief." *See* (Doc. 17-7, ¶ 35).

(12) Perlmutter improperly implied in emails that Paymaxx is non-compliant with PCI and NACHA compliance standards.[19]

In further support of the alleged on-going violations, Plaintiff proffers certain emails from clients indicating contact by Perlmutter. *See* (Docs. 42-1, 42-2).

In general, by her submissions and argument, Defendant responds that Plaintiffs' contentions are wholly inaccurate or wholly unsupported. By her declaration (Doc. 38), she denies that she accessed or even had access to Paymaxx's confidential client spreadsheets and she urges that Plaintiffs have no evidence to support these allegations, thus their allegations are pure speculation. By her averments, her clients were maintained by her in a separate "Act" database that never before existed for Paymaxx clients. The Paymaxx client list was kept in a separate system to which she denies having access. Defendant denies that Plaintiffs had any prior contracts with any of the clients she brought with her to Paymaxx.

Defendant argues that Plaintiffs fail to offer any evidence of improper solicitation of Paymaxx clients by her and she denies the same. While she admits to doing business currently in Tennessee, she argues there is no showing that this violates any of the restrictive covenants. Plaintiffs are not conducting business in Tennessee. While she does not acknowledge that she is doing business with clients on her book of business, it appears her position is that even if she is, she is free to do so because they are her clients, not Plaintiffs' clients.[20] She avers that Plaintiffs never had any contractual relationship with a customer from

---

[19]*See* (Doc. 17-6).

[20]Defendant has filed an affidavit and one from Joe Radest, executive vice president and partner in Merchant Pro Express (MPX) (Docs. 44-1, 44-2) apparently in support of her claim that this is her book of business.

her book of business, although she admits that she contacted those customers after joining Paymaxx and advised them that she would continue to service them through Paymaxx and that Plaintiffs enjoyed a significant revenue stream by reason of this book of business.

As for the particular allegations related to AutoStar, while admitting she had post-termination contact with it, she denies the allegations of tortious misconduct and urges that AutoStar terminated its relationship with Leedom for several business reasons, including dissatisfaction with Leedom's performance, the relationship not producing anticipated revenue, and a dispute over audits and monies owed to AutoStar. In support, she proffers the affidavit of Allen Dobbins, president of AutoStar Solutions. (Doc. 38-2). According to Perlmutter, in December 2011, Plaintiffs raised their prices globally, sought onerous three-year contracts with substantial liquidated damage clauses from their clients, and advised many of their clients of this litigation and their own litigious nature. It is for these reasons, and not anything she has done, that Leedom has experienced disruption in their business.

As for the allegations concerning Sigma, she admits post-termination work with Sigma as an independent contractor for a brief period of time but denies that she did so within fifty miles of a Paymaxx location or by using any information from Paymaxx separate from her book of business. She submits records from Texas showing that Sigma was formed as a Texas corporation in July 11, 2011. (Doc. 39-3).

Perlmutter does not deny that while with Leedom, she formed Perlwood Holdings, LLC, dba "PerlPayments." She claims this was only done when Plaintiffs declined to do business with certain of her customers, those not in the auto sales business, who followed her from MBK. By her account, she was forced to create a company to service those customers

rejected by Leedom. As soon as Jim Garvin, Leedom's COO, agreed to reverse course and offer service to these customers, she dissolve Perlwood Holdings. She urges that Paymaxx never did service these customers as promised, and thus the only clients at issue would be ones that Paymaxx expressly declined in any event. Defendant files copies of the incorporation documents reflecting Perlwood Holdings, LLC, was formed as a Florida limited liability company on March 25, 2011, and voluntarily dissolved two months later on May 26, 2011. (Doc. 39-2).

Defendant does deny that she "solicited" Leedom employees as urged by Plaintiffs. Rather, Woods and Duncan both came with her from MBK as part of what she brought to Paymaxx. They became principals in Perlwood Holdings because of their familiarity with the customers and helped service those customers that Leedom was refusing to serve.

Finally, Defendant files the incorporation documents for Perlpay Systems, LLC, which was registered with the State of Tennessee as a limited liability company on October 20, 2011, subsequent to her employment with Paymaxx. (Doc. 39-1). By her declaration (Doc. 38-1) and her affidavit (Doc. 44-2), she acknowledges residing in Tennessee and conducting business currently in Tennessee as an employee of Perlpay Systems, LLC, but claims to be outside the 50-mile radius of anywhere Plaintiffs are conducting business. She further attests she has complied with the TRO, has not solicited Plaintiffs' clients, and has not disclosed any trade secret or confidential information at any time. By her affidavit, she has not destroyed, erased, or otherwise disposed of any records or documents, including electronically stored materials that relate in any way to her business or personal finances. (Doc. 44-2).

II.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary

injunction. The purpose of a preliminary injunction is to maintain the *status quo* until the

court can enter a final decision on the merits of the case. *United States v. DBB, Inc.*, 180 F.3d

1277 (11th Cir. 1999); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir.

1974). A party seeking entry of a preliminary injunction must establish (1) a substantial

likelihood of success on the merits; (2) a substantial threat of irreparable injury if the

injunction is not granted; (3) the threatened injury to the moving party outweighs whatever

damage the proposed injunction may cause the opposing party; and (4) if issued, the

injunction would not be adverse to the public interest. *Four Seasons Hotels & Resorts, B.V. v.*

*Consorcio Barr, S.A.*, 320 F.3d 1205 (11th Cir. 2003); *McDonald's Corp. v. Robertson*, 147

F.3d 1301, 1306 (11th Cir. 1998); *Haitian Refugee Ctr., Inc. v. Baker*, 949 F.2d 1109, 1110

(11th Cir. 1991).

"[A] preliminary injunction is an extraordinary and drastic remedy not to be granted

unless the movant clearly established the 'burden of persuasion' as to each of the four

prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *All Care*

*Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).

The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must

clearly carry the burden of persuasion." *Siegel*, 234 F.3d at 1179 (citations omitted). A

plaintiff may support its motion for a preliminary injunction by setting forth allegations of

specific facts in affidavits. M.D. Fla. R. 4.06(b)(2), 4.06(b)(3). In considering a motion for

preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that

would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

## III.

## A.

As to the first element, Plaintiffs must establish that they have a substantial likelihood of succeeding on the merits. Florida law recognizes that courts may enforce "contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business. . . ." Fla. Stat. § 542.335(1). There is no real argument that these limitations are unreasonable as to time and area. By my consideration, Plaintiffs adequately demonstrate the violations alleged above at (2), (6), (7) and (12) in relation to three of the restrictive covenants. Thus, as indicated above, by the Offer Letter, Perlmutter is restricted from directly or indirectly, individually or for any other entity or person, doing any of the following:

(a) engaging in any business or endeavor which is similar to all or any portion of the business of Leedom or undertake to work for or with any entity which is engaged in any business or endeavor which is similar to all or any portion of the business of Leedom;

or

(b) disclose any information relating to Leedom to any entity for any reason, unless such disclosure is on Leedom's behalf and reflects the best interests of Leedom;

or

(c) solicit any entity which Leedom has established a substantive business relationship for a period of 1 year following the termination of your employment by Leedom.

(Doc. 17-1 at 3).[21] First, Plaintiffs have demonstrated that Defendant engaged in a business or endeavor that is similar to Leedom's business during her employment, as well as within one year after. While an employee of Leedom, she admittedly formed Perlwood Holdings, LLC, and did business thereunder as PerlPayments. By her account, her purpose in forming this entity was to provide payment processing services for those clients that Plaintiffs refused to service. Be that as it may, the restrictive covenant prohibited her from directly or indirectly engaging in any business or endeavor which is similar to all or any portion of the business of Leedom during her employment. Thus, her formation and operation of Perlwood Holdings, LLC, constituted a breach of this provision of the Offer Letter. Additionally, following her termination from Leedom, Defendant worked in some capacity with Sigma during September 2011 offering ACH payment processing services. Sigma is located in Ft. Worth, Texas, as is AutoStar, a company with whom Plaintiffs did business. Defendant's work with Sigma in Texas, within a year of her termination, would fall within the geographic and temporal limitations of the covenants. Further, whether her work was as a consultant, independent contractor, or employee, by whatever name, such work violated that provision of the Offer Letter that precluded her from directly or indirectly undertaking "to work for or with any entity which is engaged in any business or endeavor which is similar to all or any portion of the business of Leedom."

---

[21]These three covenants are limited geographically such that Perlmutter is prohibited from engaging in these activities within a 50-mile radius of any location where Leedom is conducting business, and temporally in that the restrictions apply during her employment and for one year thereafter.

On the other hand, Defendant's formation and operation of Perlpay Systems in Tennessee does not violate this restrictive provision as Plaintiffs admittedly do not operate in the State of Tennessee, and thus her activity there falls outside the geographic scope of the restrictive covenant. That said, to the extent that Defendant, through Perlpay, is soliciting or attempts to solicit Leedom clients or otherwise discloses information not in the best interests of Leedom, the restrictive covenants are invoked.

There is also some limited evidence demonstrating that Defendant breached that provision of the Offer Letter that precluded her from disclosing any information relating to Leedom that does not reflect the best interests of Leedom. Plaintiffs have proffered an email communication from Defendant to undisclosed recipients dated December 2, 2011, (Doc. 17-6 at 2-4), wherein Defendant represents that cancelling Paymaxx Pro will allow the email recipients to eliminate "arbitrary" compliance fees which suggests that Paymaxx Pro is charging arbitrary compliance fees and was clearly not offered by Defendant in the best interests of Plaintiffs. The further advice that the recipient should always request proof of compliance with NACHA authorization standards arguably suggests Paymaxx Pro may not be compliant. These statements, made via email, were disseminated within a year of her termination and accordingly violate provision (b) of the restrictive covenants.

As for provision (c) of the Offer Letter which prohibits solicitation by Defendant of "any entity which Leedom has established a substantive business relationship for a period of 1 year following the termination of [her] employment with Leedom," there is ample evidence to support the conclusion that Defendant has solicited and attempted to do business with clients from the book of business she brought to and serviced while she was employed by Plaintiffs.

15

Such is demonstrated by Defendant's email solicitations to South Jersey Auto (Doc. 17-4 at 2), and Defendant's email to Barrett Motors (Doc. 17-6 at 4).[22]  Both South Jersey Auto and Barrett Motors are on the client list that was attached to the Offer Letter.  As previously discussed, the parties dispute who has a claim to this book of business.  I think it unnecessary to resolve ownership on this motion.  Rather, on the basis of the plain wording of the restrictive covenant, it is enough to conclude that Defendant's attempt to solicit any of these customers with whom Plaintiffs had developed a substantive business relationship is a breach of the covenant.  On the available evidence, Defendant acknowledges that she serviced these clients while she was employed at MBK and with Paymaxx Pro once she came onboard.  Plaintiffs, thereafter, had the benefit of the revenue stream generated from this work.  (Doc. 38-1, ¶ 18).  Such would indicate the requisite substantive business relationship for Plaintiffs to invoke this restrictive covenant.  While Defendant's affidavit states, "[t]he only access to the revenue streams of my customers that Paymaxx Pro, LLC or Leedom Management Group, Inc. [had] was through my willingness to allow them to serve my book of business so long as I continued in their employ," *see id.*, ¶ 17, such is not reflected in the Offer Letter or by other agreement before the court.  Significantly, the non-solicitation covenant does not so favorably qualify the limitations placed on Defendant for soliciting those clients and, in fact, prohibits her from soliciting for one year after her employment any client with whom Leedom had developed a substantive business relationship.  It follows then that any efforts by Defendant to

_____

[22]While Sigma's letter of solicitation to Matt's Motors (Doc. 42-1) may ultimately be traced back to Defendant, given the lack of proof that Defendant is still actively engaged in any capacity with Sigma, on this record, I cannot conclude this particular communication provides adequate support for injunctive relief.

solic such clients away from Leedom would violate provision (c) of the Offer Letter, and I conclude that Plaintiffs are entitled to the benefits of the restrictive covenant for any such of these customers as it established a substantive business relationship with.

For these reasons, there is sufficient proffer of evidence to support the conclusion that Defendant has violated one or more of these restrictive covenants and Plaintiffs are likely to succeed on the merits of such claims.

Otherwise, I find Plaintiffs' proof lacking at this point to establish a violation of the two remaining covenants prohibiting Defendant from divulging any confidential or trade secret information of Leedom's and further prohibiting her from inducing or attempting to induce any employee from terminating his or her employment with Leedom. And, concerning the numerous other alleged violations urged by the Plaintiffs, at present, I conclude either that such do not warrant injunctive relief or that they fail for want of sufficient proof. As noted above, several of the Defendant's alleged violations are asserted "upon information and belief" or otherwise lack any evidentiary proof other than an unsupported statement in Chris Leedom's affidavit. With only speculation and supposition on these points, Plaintiffs fail to meet their heavy burden in order to justify an award of injunctive relief. *See Touchston v. McDermott*, 120 F. Supp. 2d 1055 (M.D. Fla. 2000) (quoting 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (2d ed.1995) ("[W]hen the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for preliminary injunction.")). Thus, the alleged violations set forth above and identified as (1), (3), and (8) -

(11) are not sufficiently supported on this motion to allow for the conclusion that Plaintiffs are substantially likely to succeed on the merits of those claims.

On the issues of whether (4) Perlmutter used Leedom resources to process "her" clients' payments and (5) Perlmutter solicited and used current Leedom employees to aid her in her business ventures, if all that occurred is what is proffered, such does not warrant injunctive relief. This limited proffered evidence relates to Defendant servicing certain of her former clients after she joined Plaintiffs when she was purportedly told that Leedom would not service them and her formation of Perlwood Holdings, LLC, to address these clients. Even assuming Plaintiffs can prove these violations and more, if this is the full extent of the matter, these are past and discrete events and would not merit injunctive relief. As for such violations, an award of damages offers the appropriate remedy.

## B.

On the issue of irreparable harm, Plaintiffs claim that Defendant's conduct has caused and continues to cause damage to the goodwill they enjoy in the payment processing industry as well as to destroy the competitive advantage they have obtained through considerable efforts and expenditures of money. It is true that, "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Ferrellgas Partners, L.P. v. Barrow*, No. 04-12548, 2005 WL 1736276, at *7 (11th Cir. July 26, 2005) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)). To qualify as irreparable harm, the asserted injury "must be neither remote nor speculative, but actual and imminent." *Siegel,* 234 F.3d at 1176-77 (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990)). "An

18

injury is 'irreparable' only if it cannot be undone through monetary remedies." *City of Jacksonville*, 896 F.2d at 1285.  The possibility that adequate compensatory relief will be available at a later date, in the ordinary course of litigation, weighs heavily against injunctive relief.  *Id.*  A plaintiff may, however, establish irreparable injury where there is a loss of customer goodwill because the damages flowing from such losses are difficult to calculate.  *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

I find this a fairly close issue.  As discussed, much of what Plaintiffs complain about is adequately remedied by damages should Plaintiffs prevail.  On this motion, Plaintiffs do not demonstrate harm to their corporate reputation.  However, their proffered evidence does suggest some damage to the goodwill they have apparently developed in the payment processing industry as well as confusion within that industry by reason of this dust-up and Defendant's efforts, post-termination, in securing business away from Plaintiffs.  Defendant has demonstrated that she is not above using information she no doubt learned while under Plaintiffs' employ against them and such would likely continue absent an injunction.  Such harms are better addressed by injunctive relief and thus I conclude that this factor weighs in favor of the Plaintiffs.

## C.

A balancing of the equities here is fairly a wash.  Absent any showing of wrongful conduct on their parts, Plaintiffs should be allowed the benefits of their agreement with Defendant which included servicing her book of business as their customers.  On the other hand, entry of an injunction deprives Defendant of clients which she developed over time and brought with her to Plaintiffs at some considerable cost.  However, Defendant is not left

without the means to continue to work in this trade as her current operation in Tennessee in and of itself does not violate the restrictive covenants and need not be wholly enjoined.

## D.

Finally, the entry of a preliminary injunction would not disserve the public interest in enforcing contracts. The award of an injunction serves to provide both parties the benefit of the bargain they made. Enforcement of the same on this record does no harm to the public interests.

## IV.

For the foregoing reasons, it is recommended that Plaintiffs' Motion for Preliminary Injunction against Defendant Perlmutter (Doc. 17) be **granted** and a preliminary injunction entered pending further order of the court on the following terms:

1) Perlmutter, and all other persons or entities in active concert or participation with her are enjoined from engaging in or assisting others in engaging in a business or endeavor of the same nature and kind as that of Plaintiffs for a period not to exceed one year from the date of entry of the TRO[23] within a 50-mile radius of a location where Plaintiffs are conducting business;

---

[23]By my consideration, the one-year time period should be calculated from entry of the TRO. *See Johnson Controls, Inc. v. Rumore*, No. 8:07-cv-1808-T-17TBM, 2008 WL 203575, at *14 n.18 (M.D. Fla. Jan. 23, 2008) (quoting *Polaris Pool Sys., Inc. v. Great Am. Waterfall Co.*, No. 8:05-cv-1679-T-TGW, 2006 WL 289118, at *6 (M.D. Fla. Feb. 7, 2006) (time periods within restrictive covenants may be appropriately tolled pending a motion for temporary or preliminary injunctive relief)).

2) Perlmutter, and all other persons or entities in active concert or participation with her, are enjoined from soliciting any entity or person with which or whom Plaintiffs have established a substantive business relationship as well as any current employee of Plaintiffs for a period not to exceed one year from the date of entry of the TRO;

3) Perlmutter, and all other persons or entities in active concert or participation with her, are enjoined from divulging Plaintiffs' confidential, proprietary or trade secret information and from otherwise disclosing any information relating to Plaintiffs to any entity for any reason, unless such disclosure is on Plaintiffs' behalf and reflects the best interests of Plaintiffs for a period not to exceed one year from the date of entry of the TRO;

4) Perlmutter, and all other persons or entities in active concert or participation with her, are enjoined from destroying, altering, concealing or disposing of any records and communications, in whatever format, related to her employment with Plaintiffs, her self-employment during and after her employment with Plaintiffs, her business relationships and practices and her personal and business finances for a period not to exceed one year from the date of entry of the TRO.

5) By my consideration, the bond posted under the TRO should be increased to at least $50,000.00.

Respectfully submitted on this
15th day of February 2012.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
Honorable Virginia M. Hernandez Covington, United States District Judge
Counsel of Record